Re In the Matter of **QUALITY SPICE CORPORATION, a New York Corporation.**

**Civ. A. No. 89–2720.**

United States District Court,
D. New Jersey.

Nov. 27, 1989.

George R. Hirsch, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime, Roseland, N.J., and Howard L. Simon, Brauner, Baron, Rosenzweig, Kligler, Sparber, Bauman & Klein, New York City, for Man Producten Rotterdam BV.

Michael D. Sirota, Cole, Shotz, Bernstein, Meisel & Forman, Hackensack, N.J., and Douglas E. Quinn, McGrath, North, Mullin & Kratz, P.C., Omaha, Neb., for Camerican, a Div. of CTC North American, Inc.

Jeremy Galton, Scheider & Weiner, Newark, N.J., for First Fidelity Bank, N.A., New Jersey.

## OPINION AND ORDER

LECHNER, District Judge:

This is an appeal by Camerican, a Division of CTC North American, Inc. ("Camerican") from a final order of the Bankruptcy Court, dated 21 April 1989, approving a settlement of a controversy among Quality Spice Corp. ("Quality Spice"), the Estate of Quality Spice Corp. (the "Estate") and Man Producten Rotterdam, BV ("Man Producten"), Ludwig Mueller Co., Inc. ("Ludwig Mueller"), Lonray, Inc. ("Lonray"), C.F., Sauer Company ("C.F. Sauer"), First Fidelity Bank, N.A., New Jersey ("FFB") and McCormick & Co., Inc. ("McCormick") (collectively, "Appellees" or the "settling parties"). Also at issue is the Appellees' motion to dismiss on grounds of mootness and equity. Jurisdiction is based upon 28 U.S.C. 158(a).

*Facts*

The present controversy emerged from bankruptcy proceedings filed under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, *et seq.*, by Quality Spice on 26 January 1988. Bankruptcy Docket Sheet No. 88–00460 ("Bankruptcy Docket"). Quality Spice, before the filing of its Voluntary Petition in Bankruptcy, was in the business of buying and selling spices, pepper chief among them, and trading future delivery contracts in spices. Affidavit of Howard L. Simon in Support of Motion to Dismiss Appeal on Grounds of Mootness ("Simon Affidavit") at 4. It was one of the largest traders in the New York pepper market, *id.*, and was very active in the pepper market in general.[1] As a result of this trading and Quality Spice's chaotic bookkeeping methods, when the bankruptcy filing was effected there were over five thousand tons of pepper stored in facilities throughout the Port of New York to which more than thirty pepper traders or users claimed ownership.[2] *Id.*, ¶ 5. The claims eventually narrowed to ninety lots stored in eight warehouses. It appears Quality Spice had allowed warehouse receipts or delivery orders for the same lots of pepper to be delivered to more than one buyer.

On 4 March 1988, Quality Spice instituted Adversary Proceeding 88–0165 against the warehouses and the other facilities in which the pepper was stored, seeking to have in excess of one thousand tons of pepper held by them turned over to it. On 15 March 1988 the Creditors' Committee, with the consent of Quality Spice, filed a Counterclaim and Third Party Complaint, in which some 135 Quality Spice customers, suppliers and others were named as third-party defendants. This Third Party Complaint sought to restrain delivery to any party making a demand on any pepper for which Quality Spice had been in the chain of title. The Third Party Complaint also sought to require that each purchaser or seller move in the Bankruptcy Court to establish (or to re-establish) that party's claim to specified lots of pepper. A Temporary Restraining Order (which subsequently ripened into an Injunction) was issued by Bankruptcy Judge Daniel J. Moore on 18 March 1988, halting all deliveries of such pepper unless pursuant to court order. The Injunction continued in force until lifted by the Bankruptcy Court Order approving the Settlement with respect to pepper lots subject to the Settlement Agreement on 21 April 1989. *Id.* at ¶ 8.

With the pepper deliveries halted by Judge Moore's injunction, various parties moved to establish title to specific lots of pepper. Ludwig Mueller claimed an interest in 4,927 tons of pepper, of which only

---

**1.** Pepper is a commodity, the price of which is evidently subject to wide fluctuations. In the months preceding Quality Spice's filing for bankruptcy, the price reached a high of $2.60 per pound. On 26 January 1988 when Quality Spice filed for bankruptcy, the price was between $2.40 and $2.50 per pound. By November 1988 it fell to a low of $1.00 per pound and then rebounded in April 1989 to about $1.60 per pound. Simon Affidavit, ¶¶ 5, 15.

**2.** Pepper is traded in lots. Each lot contains approximately fifteen metric tons or thirty-three thousand pounds of the spice. Simon Affidavit at 3.

1,308 tons were located.[3] *Id.* Extensive hearings were held before Judge Moore. Pursuant to court order, the Creditors' Committee (the "Committee") retained the services of Peterson and Co. ("Peterson") to document those creditors with claims in the lots of pepper and to determine the physical location of each of those lots. Debtor's Supplemental Disclosure in Support of Settlement Agreement ("Supplemental Disclosure"), at 2. The firm of Crummy, Del Deo, Dolan, Griffinger & Vecchione ("Crummy Del Deo") was appointed counsel to the Committee.

All of the books and records of Quality Spice were turned over to the Committee and Peterson. Supplemental Declaration at 4. This discovery included thousands of pages of documents, including all checks and check registers, invoices of sales, accounts payable and receivable ledgers and loan documents. *Id.* During these proceedings, several depositions were taken, including those of Lonray, Ludwig Mueller, McCormick, Camerican, FFB, DMT New York, Inc. ("DMT"), another corporation claiming rights to pepper and Man Producten, as well as Robert Newhouse ("Newhouse"), the president of Quality Spice. *Id.* at 5. Quality Spice then sued thirteen different entities, the most important of which was Man Producten.

Certain amounts of pepper were released from time to time as the numerous claims to ownership of the lots were adjudicated. However, most attempts to release pepper were unsuccessful because of the complex and chaotic records as to the ownership of particular lots of pepper. Supplemental Disclosure at 6. Due partly, it appears, to the volatility of the pepper market, Quality Spice attempted to sell the lots of pepper and hold the proceeds in escrow. Once again, objections were filed by most of the creditors. Only three lots were sold in this attempt. *Id.* at 7.

After investigation, Peterson drafted a report (the "Peterson Report"). The Peterson Report and discovery disclosed that unless a settlement could be made as to the pepper claimed by Man Producten, the Estate had no assets other than contested causes of action. As litigation progressed, substantial costs mounted for storage of the pepper in warehouses. In addition to the claims various brokers, buyers and users of pepper had to the pepper, there were the security liens of FFB in all Quality Spice's inventory, accounts receivable, general intangibles, chattel paper, instruments, and deposit accounts. Brief of Appellees FFB and Quality Spice ("Appellees' Brief") at 1, 5.

The costs of litigation and the fluctuation in pepper prices were a constant spur to settlement and therefore led to negotiations among the various claimants of the pepper. Transcript of Approval of Settlement of Controversy (29 March 1989) at 48 ("Tr. at ——"). These negotiations resulted in a Settlement Agreement (the "Agreement") which was reported to the court by Man Producten, FFB, Ludwig Mueller, Lonray, C.E. Sauer and Quality Spice. Camerican, which was not a party to the Agreement, was present in court at the time of this report on 3 February 1989. Simon Affidavit at 6. The Agreement met with objections from McCormick, Crummy Del Deo and Peterson, as well as Camerican.

In response to these objections, somewhat greater benefits were made to the Estate, primarily in the release of more pepper to the Estate, and McCormick became a settling party. Simon Affidavit, ¶ 12. Pursuant to the Agreement, lots of pepper were to be distributed among the parties and various legal claims each party had against the other and in the various lots of pepper were to be released.[4] Simon Affidavit at 7. The Agreement provided that the signatories to it would pay the warehouse fees for the stored pepper. A pool of sixty-nine tons of pepper was to be

---

**3.** The value of this pepper is subject to debate because, as noted, the value of a lot of pepper fluctuated between $85,000 and $30,000 during the course of bankruptcy proceedings. Simon Affidavit, ¶ 5.

**4.** Lots claimed by DMT were not subject to the agreement until the Bankruptcy Court declared those claims invalid.

released to the Estate to pay administrative claims, primarily those of Crummy Del Deo and Peterson. The legal claims of Lonray, Ludwig Mueller, C.F. Sauer, FFB and Man Producten against Quality Spice were to be released or, where a lawsuit had been filed, dismissed with prejudice. In return, Quality Spice was to drop all claims it had against the settling parties. The Estate, contingent upon the price of pepper, was to receive about $475,000. Summary of Debtor's Supplemental Disclosure in Support of Settlement Agreement ("Summary") at 11.

On 29 March 1989 a hearing was held before Judge Moore in which the sticking points of the Agreement were ironed out. Camerican was present and protested vigorously as to the results of the settlement on unsecured creditors. Tr. at 7. At this hearing notice problems as to the Agreement were noted; the court took steps to provide proper notice. Tr. at 57–58.

On 21 April 1989, the settling parties presented the Agreement in a revised form and requested the court approve the terms of the revised Agreement. Simon Affidavit, ¶ 13. Judge Moore, after a hearing at which Camerican was present, entered an Order Approving Settlement of Controversy on 21 April 1989 (the "Order Approving Settlement"). *Id.* It is the Order Approving Settlement which Camerican has appealed.

The Agreement provided for the manner in which it could become effective:

(A) This Agreement may be consented to by the Settling Parties in counterparts, but This Agreement will not be effective (except to the extent as provided in § 0.8(B) below), unless and until (i) it is executed by all Settling Parties, (ii) its provisions are So Ordered by the Court, as provided above, and (iii) the Order becomes a Final Order. All payments and transfers due under the terms of This Agreement shall be made within five (5) business days of the entry of a Final Order.

(B) Upon the unanimous consent of all Settling Creditors (but not otherwise) this Agreement may become effective and the payments and transfers which are specified in This [sic] Agreement may be made in advance of a Final Order on any date agreed to by the Settling Creditors following the date upon which This [sic] Agreement is So Ordered.

First Amendment to Settlement Agreement 0.8(A) and (B). Because of the previously noted fluctuations in the price of pepper and the forecast that the price of pepper was due to drop in the next few months, FFB, for itself and other settling parties, announced in court its intention to exercise its rights and sell the pepper as soon as possible. Simon Affidavit, ¶ 14, 15.

On 3 May 1989 Camerican filed its Notice of Appeal from the Order Approving Settlement. On 12 May 1989 FFB, on behalf of the settling parties, wrote a letter informing Camerican that unless the Order Approving Settlement was stayed pending appeal, all the settling parties would exercise their rights under the Agreement. Simon Affidavit, Exhibit B. This letter informed Camerican that if the Order Approving Settlement was not stayed and settling parties did exercise their rights, they would contend that the appeal had been rendered moot.

Camerican did not move to stay the Order Approving Settlement nor did it seek an expedited appeal. On 31 May 1989, after hearings on 21 April and 3 May 1989, the Bankruptcy Court issued an order that set the storage charge fees and directed that upon payment of same the warehouses were to release the pepper to the settling party. 31 May 1989 Order Determining Reasonable Storage Charges (Simon Affidavit, Exhibit C).

On 20 June 1989 the settling parties met and closed pursuant to paragraph .08(B) of the Agreement. Many positions and transactions were irrevocably changed at this meeting.[5]

Pursuant to the Agreement, Man Producten delivered to Quality Spice $1,500,000. Quality Spice then paid FFB $1,345,000.

---

5. An exhaustive description of these transactions can be found in the Simon Affidavit and the Compendium of Affidavits attached to it as Exhibit A ("Compendium").

Quality Spice also delivered a Stipulation of Dismissal to Man Producten which dismissed with prejudice Adversary Proceeding No. 88–0210. Simon Affidavit at 17. As a result of the Agreement, a replevin action filed against Federation Warehouse ("Federation") in the Eastern District of New York was dismissed with prejudice and McCormick paid Federation's attorneys $7,500 in counsel fees. *Id.* at 17. Another court case, an interpleader action in the Supreme Court of the State of New York involving Mueller, Lonray and Federation, was dismissed with prejudice. Moreover, other non-parties to the Agreement such as Federation, including Van Brunt Warehouses ("Van Brunt"), Importers Storage and Distributing Inc. ("ISD") and Jantzeen and Deeke ("Jantzeen") released pepper, gained pepper or received payment as a result of the Agreement. *Id.* at 12, 14 and 16. Each settling party released all interest and claims including liens it had in pepper allocated to others in return for those others releasing all claims in pepper allocated to it.

Releases were given, millions of dollars were exchanged and the claims to tons of pepper were settled. After the Agreement was closed, substantially all of the pepper was sold or used and the warehouses were reimbursed for the long period of storage. Simon Affidavit at 17.

Camerican appealed the Bankruptcy Court's order on 3 May 1989. On 7 August 1989 Appellees filed a Notice of Motion to Dismiss the Appeal on grounds of mootness and equity. Quality Spice, FFB, Lonray, Ludwig Mueller, McCormick and C.F. Sauer all joined Man Producten's motion to dismiss.

*Discussion*

The appeal of Camerican and the motion to dismiss that appeal are both at issue. The motion to dismiss on the grounds of mootness and equity will be addressed first.

A. Timeliness

Camerican argues, as a preliminary matter, that the motion filed 7 August 1989 to dismiss the appeal is untimely under Bankruptcy Rule 8009 and the Local Rules of this Court. Brief of Camerican in Response to Motion to Dismiss Appeal filed by Man Producten, ("Camerican Dismissal Opposition") at 3–4. Camerican argues that FFB was given an extension of time to file a responsive brief to the Camerican appeal but no extension was granted to Man Producten and that it would be inequitable to permit the motion to dismiss Camerican's appeal when Man Producten's brief would have been untimely pursuant to the Local and Bankruptcy Rules. *Id.* at 14.

Bankruptcy Rule 8011 governs motions on appeal. It states:

**(a) Content of motions; response; reply**

A request for an order or other relief shall be made by filing with the clerk of the district court or the clerk of the bankruptcy appellate panel a motion for such order or relief with proof of service on all other parties to the appeal. The motion shall contain or be accompanied by any matter required by a specific provision of these rules governing such a motion, shall state with particularity the grounds on which it is based, and shall set forth the order or relief sought. If a motion is supported by briefs, affidavits or other papers, they shall be served and filed with the motion. Any party may file a response in opposition to a motion other than one for a procedural order within seven days after service of the motion, but the district court or the bankruptcy appellate panel may shorten or extend the time for responding to any motion.

Bankruptcy Rule 8011(a). Although the rule provides a time limit for filing responses to motions on appeal, no time limit is given for the filing of the motions themselves. Rule 8011(a) does not address the point Camerican raises nor does Camerican demonstrate any violation of the rules.

■ District courts have the power to make and amend rules governing the practice and procedure for appeals provided those rules are not in conflict with the bankruptcy rules. *In re Duncan,* 95 B.R.

672, 673 n. 1 (B.C.W.D.Mo.1988). The Local Rules of this court are not in conflict with the Bankruptcy Rules and nothing in section 8011 prevents a party from filing a motion to dismiss as was done in this case. Moreover, the Response Brief of Appellees FFB and Quality Spice ("Appellees' Response Brief") states that all Appellees "have filed or are about to file a motion to dismiss." Appellees' Response Brief at 14. Thus, at the time the Appellee's Response Brief was filed it was clear an additional motion would be forthcoming. All of the Appellees have joined in the motion to dismiss.

■ As to equity, Camerican sought and received from Man Producten's counsel an extension of time in which to file its brief in the dismissal motion so that it would coincide with the schedule worked out with FFB on the Reply Brief. Letter of Counsel for Camerican, received in chambers 14 August 1989. Camerican has shown no reason why Man Producten for all the Appellees could not file a motion to dismiss and support for that motion. There is no prejudice to Camerican which received ample time to submit an opposition brief to the motion to dismiss; accordingly, there is no inequity in entertaining Man Producten's Motion to Dismiss.[6]

### B. Mootness

■ Appellees contend that events since the Order Approving Settlement of the bankruptcy court have mooted this action. The Constitution of the United States requires that federal courts have a case or controversy before them. U.S. Constitution, Art. III § 2. When a dispute ceases to be sufficiently alive to qualify as a controversy, it is not fit for federal adjudication. *Lane v. Williams*, 455 U.S. 624, 630–31, 102 S.Ct. 1322, 1326–27, 71 L.Ed.2d 508 (1982); *Frank v. Bowman Transport Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Dow Chemical Co. v. U.S. Environmental Protection Agency*, 605 F.2d 673 (3rd Cir.1979).

The Supreme Court has stated: "The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in the case before it." *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895) (quoted in *N.J. Turnpike Authority v. Jersey Central Power and Light*, 772 F.2d 25, 30 (3d Cir.1985)).

■ A prime concern in determining questions of mootness is whether all or part of the relief requested is still effectively available. *FireFighters Local 1590 v. City of Wilmington*, 824 F.2d 262, 265 (3d Cir.1987). However, "mootness is fundamentally a matter of degree; there is no precise test for ascertaining with precision whether a particular claim has become moot." *International Brotherhood of Boilermakers v. Kelly*, 815 F.2d 912, 915 (3d Cir.1987). Because of this a determination of mootness becomes "an intensely factual inquiry." *Id.* (quoting *Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442, 463 (S.D.Fla.1980), *modified*, 676 F.2d 1023 (5th Cir.1982). "The central question of all mootness problems is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Jersey Central Power & Light Co. v. The State of N.J.*, 772 F.2d 35, 39 (3d Cir.1985). An appeal should be dismissed if events occur during the pendency of an appeal which prevent the appellate court from granting any effective relief. *In re Cantwell*, 639 F.2d 1050, 1053 (3d Cir.1981).[7]

■ If an act or event sought to be enjoined has been performed or has oc-

---

**6.** Even if there were a defect in Man Producten's motion, because mootness questions the jurisdiction of the court to hear a case, facts regarding it can be heard at any time during the proceedings. *Honig v. Doe*, 484 U.S. 305, 317, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988) (mootness can be raised at oral argument); *In re Cantwell*, 639 F.2d 1050, 1053 n. 4 (3d Cir.1981).

**7.** In the largest bankruptcy case in United States history, the court explained:

The mootness doctrine is premised first and foremost on the fundamental jurisdictional tenet that Federal courts are empowered to hear only live cases and controversies. U.S. Const. art. III, § 2. Thus, it is well settled that

curred while the case is pending, an appeal from the denial of an injunction will be dismissed as moot. *Id.* at 1054. Indeed, if an event occurs which prevents the appellate court from granting effective relief even if the dispute is decided in favor of the appellant, the case must be dismissed. *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 150, n. 6 (3d Cir.1986). The inability of the court to grant relief removes jurisdiction and the case may not be heard.[8] In deciding whether a case is moot because of a lack of remedy "it is entirely proper for a court to focus on its present ability to provide any meaningful remedy in light of changed circumstances relating to the case." *Kirby v. U.S. Government Dept. of Housing and Urban Development,* 745 F.2d 204, 207 (3d Cir. 1984). Changed circumstances will frequently moot only some forms of relief, leaving other useful forms available. *Id.*

The special setting of bankruptcy also affects the issue of mootness and related principles of equity.[9] "Effective relief is impossible if funds have been disbursed to persons who are not parties to the appeal or if failure to obtain a stay has permitted such a comprehensive change as to render it inequitable to consider the merits of the appeal." *In re Blumer,* 66 B.R. 109, 113 (9th Cir.BAP 1986), *aff'd mem.,* 826 F.2d 1069 (9th Cir.1987). The mootness doctrine

has been applied to bankruptcy appeals, often in the context of failure to obtain a stay of the bankruptcy court's order. *See Miami Center Limited Partnership v. Bank of New York,* 838 F.2d 1547 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 69, 102 L.Ed.2d 46 (1988) (Where debtors failed to post a bond and title to land had changed hands, a judgment lien given up, and over $13.5 million in cash had been paid along with the release of $30 million cash collateral, mootness found); *In re Roberts Farms, Inc.,* 652 F.2d 793 (9th Cir.1981) (where no stay obtained and plan of arrangement substantially underway appeal was moot); *In re Information Dialogues, Inc.,* 662 F.2d 475, 476–77 (8th Cir. 1981) (where no attempt to stay or obtain bond to prevent confirmation order and priority wages had been paid, small creditors paid, stocks issued to large creditors and $400,000 in investment funds obtained by confirmation and financial disclosure forms filed with SEC pursuant to confirmation, appeal was moot); *In re Cantwell,* 639 F.2d at 1053 (where discharge in bankruptcy already granted and appeal was for a previous dissolving of a stay of the discharge appeal was moot); *In re Texaco Inc.,* 92 B.R. at 45; *In re Charter Co.,* 81 B.R. 90, 92–93 (M.D.Fla.1987).

### 1. *Equitable Principles*

Related to and connected with the mootness issue are judicial considerations of

---

[8] Judge Garth has squarely addressed this issue:
I have felt compelled to write at some length about the mootness issue in the *Gluck* appeal for two reasons. First, the question of mootness goes directly to our jurisdiction to entertain the appeal. As a court of limited jurisdiction, whose ability to decide questions of law is constitutionally defined by the case or controversy requirement of Article III, we are not empowered to decide abstract or purely hypothetical questions. In the absence of a concrete and continuing case or controversy, we lack jurisdiction and hence power to decide questions of law which can have no effect on the particular litigants before the court.
*Gluck v. United States,* 771 F.2d 750, 761 (3d Cir.1985) (Garth, J., dissenting).

[9] This constitutional principle retains its vitality in the context of a bankruptcy appeal. In the absence of a stay, events may have so progressed by the time a bankruptcy appeal is adjudicated that an appellate court is powerless to grant the appellant effective relief, thereby depriving that court of its constitutional jurisdiction over the matter. When such is the case, the appeal must, as a matter of law, be dismissed as moot.
*In re Texaco, Inc.,* 92 B.R. at 45 (citations omitted).

when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for [the appellate] court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal [as moot].
*Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895). *See also Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969) (mootness doctrine "avoid[s] advisory opinions on abstract propositions of law").
*In re Texaco, Inc.,* 92 B.R. 38, 45 (S.D.N.Y.1988).

equity. As the court explained in *In re Texaco, Inc., supra:*

> In addition to these constitutional concerns, "there exists what [have been] called a 'melange of doctrines relating to the court's discretion in matters of remedy and judicial administration.' " Under this "cousin of the mootness doctrine," equitable principles of jurisprudence may dictate that a case be dismissed as moot even though a court may properly exercise its article III jurisdiction.

92 B.R. at 45 (citations omitted) (quoting *Chamber of Commerce v. United States Dep't of Energy,* 627 F.2d 289, 291 (D.C. Cir.1980)). The Third Circuit has acknowledged these doctrines stating: "In addition to its threshold constitutional dimension, mootness doctrine incorporates prudential considerations as well." *Int'l Bhd. of Boilermakers,* 815 F.2d at 915.

> These doctrines address not the power to grant relief but the court's discretion in the exercise of that power. In some circumstances, a controversy, not actually moot, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to withhold the relief it has the power to grant.

*Chamber of Commerce,* 627 F.2d at 291. These equitable considerations are especially acute if they affect interests of parties not involved in the appeal. *In re Texaco,* 92 B.R. at 46. In the present case the payments to and release of pepper by the warehousemen, release of liens and dismissal of litigation with prejudice fall into this category of concerns.

In the bankruptcy context the added consideration that orders of the bankruptcy court are to be given finality if at all possible enters the equity equation. *In re Krueger,* 88 B.R. 238, 242 n. 4 (9th Cir. BAP 1988); *In re Roberts Farm, Inc.,* 652 F.2d at 798. The certainty and finality elements are of primary concern here because of the large sums transferred, the property rights adjudicated and the court cases dismissed with prejudice. The fact that Camerican had full notice as to the intent of the parties to act on the Agreement also weighs against it in equity. Simon Affidavit, Exhibit B.

### 2. *Availability of Appropriate Relief*

■ Appellees argue that the closing of the Agreement and its concomitant sale of pepper, release of legal claims and dismissal of lawsuits with prejudice makes any decision as to the Agreement moot.[10] The appeal from the bankruptcy court's Order Approving Settlement[11] seeks to have the Agreement set aside. Appeal Brief of Camerican. ("Appeal Brief") at 25. Camerican also requests "further relief as the court may deem just and equitable." *Id.*

A reversal of the Order Approving Settlement would have no practical effect on the parties. The pepper, the only real asset of Quality Spice, is gone. It has been shipped, sold and ground and is beyond recall of this or any other court. Moreover, the Agreement did not merely adjudicate who was to receive what money. It settled the ownership rights in hundreds of tons of pepper which had been the subject of legal battles for over a year. See Compendium §§ 2 and 7. Some of those rights to pepper were settled as to non-parties such as the warehouses and Jantzeen. A replevin action by McCormick against Federation Warehouse in the Eastern District of New York was dismissed with prejudice. Simon Affidavit, ¶ 21(G). Similarly, an interpleader action in the Supreme Court of New York involving Mueller, LonRay and Federation was dismissed with prejudice. *Id.,* ¶ 21(H). This is in addition to the numerous releases to claims on pepper given to parties and non-parties.

In *Thibaut v. Ourso,* 705 F.2d 118 (5th Cir.1983), a settlement agreement mandat-

---

**10.** The 24 tons of pepper remaining with Quality Spice at the time of the Simon Affidavit has since been sold. Brief of Man Producten, Quality Spice and FFB in Reply to Responsive Brief of Camerican on Motion to Dismiss Appeal ("Dismissal Reply Brief") at 7.

**11.** There is a dispute as to the status of the Order Approving Settlement which is more fully dealt with in the Equitable Consideration portions of this opinion.

ed that money, promissory notes and securities change hands and that three Louisiana state court suits be dismissed with prejudice. The order was not stayed. There the court stated:

> We do not, and cannot, determine the merits of these claims. As McNutt did not obtain a stay of the district court's judgment, the provisions of the settlement document took effect. Among those provisions was the dismissal, with prejudice, of three pending state court actions. This court cannot resurrect those actions. To vacate the rest of the settlement would severely prejudice the rights of third parties and parties to this suit.

*Id.* at 120. That statement applies with equal force here. The interdependent transactions in *Thibaut* are analogous to those in the case *sub judice*. Millions of dollars have changed hands, suits have been dismissed with prejudice and positions have been altered since the parties acted pursuant to the Agreement. As the *Thibaut* court stated:

> It is impossible for this Court to vacate the judgment below, for the dismissal of the state court actions has sent that portion of the settlement irretrievably beyond our reach. Nor can we simply take the $100,000 back from McNutt, return him the promissory notes, and leave the rest of the judgment intact, for it is clear from the record that the numerous settlement provisions were interdependent. Even if we were to hold for McNutt on the merits of the case, we could not possibly return the parties to the suit, and third parties, to the legal positions they held before the settlement took effect.

*Id.* at 121.

The intricacy and dependency of the transactions completed upon the failure to seek a stay have been a major factor for courts deciding whether events have rendered a case moot. The *Texaco* court examined in depth the complex transactions involved in the reorganization plan before it and how complete the implementation had become because of appellant's failure to seek a stay. There the court noted:

> $2.3 billion has been distributed to creditors other than Pennzoil; $200 million has been paid to the Internal Revenue Service; $7 billion in long-term debt and guaranty obligations have been reinstated; Texaco's certificate of incorporation and by-laws have been amended to comply with the Bankruptcy Code; the $3 billion settlement with Pennzoil has been satisfied, and the lenders have been granted the security interests contemplated under the Financing Agreement; all derivative actions have been dismissed and Texaco has withdrawn its petition for a writ of *certiorari* before the Supreme Court; and hundreds of releases have been executed between Texaco, Pennzoil, and third parties releasing them from all claims arising out of the Texaco–Getty merger.

*Id.* 92 B.R. at 46.

In a factual setting notable for its simplicity, the Ninth Circuit declined to find a case had been rendered moot because the trial court could simply order one of the parties to return funds erroneously disbursed by the bankruptcy trustee. *In re Blumer*, 66 B.R. at 113. *In re Blumer* presented a relatively straightforward transfer of funds. There, a corporation had a first priority deed of trust on the debtor's residence. The trustee, pursuant to court order, sold the residence and placed the proceeds in a trust account. The trial court erroneously upheld the deed of trust and an order issued to pay the corporation. An unsecured creditor of the debtors failed to obtain a stay but appealed. Although funds had been transferred they had only gone to the corporation, a party in the appeal. The court reasoned a proper remedy could be obtained by simply remanding to the trial court with instructions to "order the return of any erroneously disbursed funds." *Id.* 66 B.R. at 113. The difference in size and complexity between *In re Texaco* and *In re Blumer* is vast. The facts in this "intensely factual inquiry" are more akin to *Texaco* than to *Blumer.*

Camerican argues both in its brief and at oral argument that *Abbotts Dairies* counsels against mootness in this case. Camerican notes that in *Abbotts Dairies* an entire corporation was sold by order of the bankruptcy court and yet the issue was not moot on appeal. However, *Abbotts Dairies* was a case where a statute, 11 U.S.C. § 363(m), complicated the mootness issue.[12]

In *Abbotts Dairies*, while filing for relief under Chapter 11 of the Bankruptcy Code, Abbotts sought to have agreements it had entered into with ADC, Inc. ("ADC") approved in an emergency hearing. These agreements provided first for the takeover of operations by ADC (the "Interim Agreement") and then the complete sale of Abbotts to ADC (the "Purchase Agreement"). The emergency hearing took place on the same day Abbots filed for bankruptcy. Only two secured creditors of Abbotts, Philadelphia National Bank ("PNB") and Fairmont Pennsylvania Holdings Inc. ("Fairmont") and almost by chance an attorney representing three unsecured creditors and a prospective purchaser of Abbots were present at this hearing. *Abbotts Dairies*, 788 F.2d at 145.

At the hearing it was revealed that ADC had offered to allow Abbotts' Chairman and Chief Executive Officer, Robert H. Gwinn ("Gwinn") to continue as a consultant at his salary of $150,000 (and offered other benefits to Gwinn) if the emergency Interim Agreement was approved. *Id.* The Interim Agreement was approved by the bankruptcy court and ADC was allowed to operate Abbotts until the court approved ADC's purchase of Abbotts' assets. Notice

of the motion for approval of this purchase was sent to interested parties but did not mention Gwinn's position as a consultant at the ADC controlled Abbotts or that he would be offered a permanent position and other benefits if the Purchase Agreement was approved by the bankruptcy court. *Id.* No information as to the emergency hearing or the Interim Agreement was provided. Three bids were submitted; however, all bids except that of ADC were withdrawn when the court declined to approve conditions requested by the bidders. The sale to ADC was approved but the decision was stayed at the request of Fairmont. ADC and Fairmont then entered a stipulation ending the stay; the two other companies which had appealed did not seek a stay. They argued that the lack of showing of good faith by ADC negated the necessity of obtaining a stay to prevent mootness.

Under section 363(m) the only sales that cannot be disturbed by the court are those made in "good faith." In *Abbotts Dairies*, the trial court failed to make a finding on the issue of good faith. The Third Circuit was concerned that indeed the transfer and sale had not been in good faith and that suspect dealings had in fact occurred. *Id.* at 148. If there had been a transfer of assets which was not in good faith the sale could be reversed and decisions as to it would not be moot.

In *Abbotts Dairies*, a hastily executed "emergency" transfer of the corporation had taken place early in the bankruptcy proceedings.[13] The Agreement here, despite the pressures of a fluctuating pepper

---

**12.** 11 U.S.C. § 363(b) states:

the trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. Section 363(m) states:

(m) The reversal or modification on appeal of an authorization under subjection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

The statute applies to sales made by trustees to purchasers in good faith, and in keeping with the goal of according finality to bankruptcy orders, allows reversals of such sales or leases if a stay is obtained. *In re Abbotts Dairies*, 788 F.2d at 147. Because such unstayed sales are not reversible, adjudications as to them are moot.

**13.** It is interesting to note that in *Abbotts Dairies* one of the parties (Fairmont) sought a stay and the bankruptcy court enjoined the sale of the corporation pending determination of the stay. During the period Fairmont was able to meet with Abbotts and ADC and settle its differences with them.

market, was arranged and approved over a period of many months. The completion of the transactions came as no surprise and, as counsel admitted at oral argument, Camerican was well aware of what was about to happen. Counsel admitted that plaintiffs were well informed as to the course of events.

THE COURT: I mean there is no question about your notice is there?

MR. QUINN: There is no question. Transcript of 10 October 1989 Hearing at 8.

In *Abbotts Dairies*, the mootness issue raised by section 363(m) was dealt with separately from the purely constitutional mootness issue. When the court proceeded to the constitutional as opposed to the statutory mootness question, it noted that there the factual record on the issue of mootness was inadequate. The Circuit noted that for mootness to attach one side must show that the outcome of the appeal would not affect the legal interests of the parties. 788 F.2d at 150–51. The Circuit, mindful that findings of fact were best left to the bankruptcy and district courts, noted: "They [the parties] did not introduce any evidence in either the district or bankruptcy court to substantiate the claim that the property purchased from Abbotts has been irreversibly commingled with that of ADC." *Id.* at 151.

On the issue of whether the transaction had progressed beyond the point where a court could grant effective relief, the *Abbotts Dairies* court noted that the record was unclear and neither side had met its burden of showing the outcome on appeal could not affect the parties' legal interests. *Id.* at 150–51. In that case, however, there were other claims that the court was "generally confident" were not moot. *Id.* at 151. There were NFO's allegations of lack of good faith by ADC and collusion with Abbotts. In these issues the appearances of impropriety in notice to interested parties figured prominently. *Id.* at 145–46. More importantly, the court noted: "Considering ADC's lucrative offer of employment to Mr. Gwinn, the timing of Abbotts' petitions in bankruptcy and its motion for approval of the Interim Agreement, the

situation was ripe for collusion and interested dealing ..." *Id.* at 149. In this case, the collusion and timing problems are absent, negotiations progressed for some time and the bankruptcy judge was careful on all aspects of notice. The facts and equities here differ from *Abbotts Dairies*.

Camerican contends the present case comes closest to *In re King Resources Co.*, 651 F.2d 1326 (10th Cir.1980). There an appeal was taken from a district court order confirming a plan of reorganization under Chapter X of the old Bankruptcy Act, 11 U.S.C. § 501 *et seq.* (1976). *Id.* at 1330. The plan was approved by the creditors and confirmed by the district court. The plan called for stock in the newly reformed company to be issued to general unsecured creditors. The holders of old stock would get nothing except as members of a class of defrauded unsecured creditors. *Id.* Implementation of the plan was not stayed.

In *King Resources*, the appellee argued mootness because the good faith purchasers of new stock could not be made to divest themselves of that stock if the court invalidated the plan. They also argued that the plan had been completed. The court, as in *Abbotts Dairies*, was unconvinced that substantial consummation of the plan had occurred. If it had been convinced, it intimated, the outcome would have been different. The court stated: "Hence, if we assumed that the only effect of reversal on appeal would be to order the impossible, we would not address the merits of the appeal." *Id.* at 1332. The court added:

> Nor are we persuaded on our record that appellees' claims of substantial consummation are clearly established. Before refusing to consider these appeals on the merits because of consummation which has occurred, some hearing and development of a record would be required, with more delay.

*Id.* The court compared the situation to another case where court action would have had an effect on the trustee and could force the new corporation into bankruptcy.

Although the appellant did not obtain a stay of that order, this issue differs from the other appeals covered by the trustee's motion to dismiss. If we were to conclude that the appellant is correct, and that the plan was erroneously confirmed by the district judge, then a decision to that effect could have some effect on the proceedings below. While much of the debtor's property has been liquidated, and many of the creditors have been paid, the plan still controls the actions of the trustee ...

*Id.* (quoting *Matter of Combined Metals Reduction Co.*, 557 F.2d 179, 194–95 (9th Cir.1977)).

Here, there is no question but that the deal has been consummated. Moreover, the Agreement is composed of a myriad of inseparable transactions and does not have a life after the transactions have been consummated. Unlike a reorganization plan, the Agreement does not direct actions of a trustee on a continuing basis. Here there is much on the record demonstrating these actions have been completed and nothing to the contrary. Significantly, Camerican does not contend that some transactions required pursuant to the Agreement have not been completed.

Camerican points to the pepper transactions and contends that they can all be undone by simply ordering the parties to transfer money amongst themselves. Camerican Dismissal Opposition at 9. Camerican contends it is a simple matter to convert pepper to cash equivalents by referring to its given price on a given day. However, dozens of buyers and sellers had competing claims to an enormous amount of a commodity which suffered wild changes in value. FFB had a lien on all of the pepper. Additionally, the rights of the warehouses where the pepper was stored are a necessary ingredient in this factual mix. The Agreement cut through the competing claims; reversal of the Order Approving Settlement cannot put all interested parties back in time to their prior status.

Camerican argues:

All of the players in the Settlement Agreement are heavy hitters, dealing in multi-million dollar transactions on a routine basis; there is simply nothing in the record to suggest that money damages would not be recoverable from and among these parties.

Camerican Dismissal Opposition at 9. This is simply incorrect. There is much in the record that shows money damages would not be recoverable from the parties. Quality Spice itself is insolvent. Ninety-nine tons of pepper held by it has been sold and used to pay debts. Camerican, in response to the fact of the debtors' insolvency, points to the claims held by the Estate. However, these claims were released by Quality Spice and a stipulation entered into ending the adversary proceedings. Compendium § 9. Moreover, there are no funds available to pursue these claims. Tr. at 49–50. Camerican does not address the dismissal with prejudice of the cases pending in New York state court and the Eastern District. In short, Camerican has done nothing to demonstrate as to how this case presents viable issues. In point of fact, it does not. The matter is moot.

C. Equitable Considerations

■ Even if a reversal of the Order Approving Settlement would provide adequate relief, equitable principles dictate dismissal of this appeal. The court in *In re Roberts Farms, Inc.* stated:

Here the many intricate and involved transactions, some of which were summarized in the letter (Appendix), were contemplated by the plan of arrangement (even to and including liquidation and reorganization of the debtor corporation) and stand *solely* upon the order confirming the plan of arrangement for court approval and confirmation of the transactions. Were we to deny the motion to dismiss for mootness and on consideration of the merits reverse the order of the District Court, what would be the result? Are we not quite patently faced with a situation where the plan of arrangement has been so far implemented that it is impossible to fashion effective relief for all concerned? Certainly, reversal of the order confirming the plan of arrangement, which would knock the

props out from under the authorization for every transaction that has taken place, would do nothing more than create an unmanageable, uncontrollable situation for the Bankruptcy Court.

*Id.* 652 F.2d at 797.

Similarly, here all the transactions completed, all the property rights adjudicated and all the lawsuits dismissed with prejudice would have "the props knocked out from under" them. Camerican knew the settling parties would implement the Agreement; it could have sought a stay, it did not. In explanation of this failure to obtain stay, Camerican merely cites black letter law on stays in bankruptcy proceedings. Camerican Dismissal Opposition at 4. Although it is accurate that a stay is not required to bring an appeal, it may be incumbent upon a party appealing a bankruptcy court's ruling to seek a stay lest the appeal in question be rendered moot by constitutional or *related equitable jurisprudential considerations. In re Texaco,* 92 B.R. at 45.

The consequences of failure to pursue a stay in these circumstances were aptly stated by the *Texaco* court:

> Thus, it has been held that when bankruptcy appellants " 'have failed and neglected diligently to pursue the available remedies to obtain a stay' of the Confirmation Order and thereby 'have permitted such a comprehensive change of circumstances to occur,' it is inequitable to hear the merits of their case." *Lawrence v. Revere Copper and Brass Inc. (In re Revere Copper and Brass Inc.),* 78 B.R. 17, 23 (S.D.N.Y.1987) (Leisure, J.), (quoting *Roberts Farms,* 652 F.2d at 798). This equitable rule is rooted firmly in sound notions of public policy, and promotes the orderly administration of estates by "affording finality to the judgments of the bankruptcy court." *Id.* at 21. *See also Information Dialogues,* 662 F.2d at 477 (noting that "mootness doctrine promotes an important policy of bankruptcy law—that court-approved reorganizations be able to go forward in

reliance on such approval unless a stay has been obtained").

*Id.* at 45–46.

Neglecting to pursue a stay can have grievous results for a party even if the appeal is not strictly moot.

> Appellants have failed and neglected diligently to pursue their available remedies to obtain a stay of the objectionable orders of the Bankruptcy Court and have permitted such a comprehensive change of circumstances to occur as to render it inequitable for this court to consider the merits of the appeal. The touchstone precedent for this principle is *Valley National Bank of Arizona v. Trustee,* 609 F.2d 1274 (9th Cir.1979). There our court held that the failure to seek stays coupled with a substantial change of circumstances would justify dismissal of the appeal for lack of equity. We think the thrust of this decision is that it is obligatory upon appellant in a situation like the one with which we are faced to pursue with diligence all available remedies to obtain a stay of execution of the objectionable order (even to the extent of applying to the Circuit Justice for relief (Rule 51, Supreme Court Rules)) if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

*In re Roberts,* 652 F.2d at 798.

Camerican argues that equitable principles cannot apply here as the Settling Parties do not have clean hands, their consummation of the Agreement was voluntary and the Agreement was not a final order. With respect to clean hands, the Agreement was hammered out over a long period of time. The first draft was objected to by many parties and was amended. Appellees' Brief at 12. Changes were made and all parties were afforded access to the proceedings in court. This is not a case as in *Abbotts Dairies,* where complete notice of the terms of sale was given to only a few interested parties. Any defects in notice of what was occurring were scrupulously attended to by the bankruptcy court. Transcript at 57–58. The Settling Parties were impelled by wild fluctuations in the price of

pepper. Camerican hurls charges of "insiders" [14] but the only apparent difference between the two sides are the natural differences of secured and unsecured creditors in an action where there simply is not enough money to pay all of the debtor's obligations.[15]

The Agreement itself is not a model of clarity on the issue of when the Agreement is final. It explains in pertinent part:

(A) This Agreement may be consented to by the Settling Parties in counterparts, but This Agreement will not be effective (except to the extent as provided in § 0.8(B) below), unless and until (i) it is executed by all Settling Parties, (ii) its provisions are So Ordered by the Court, as provided above, and (iii) the Order becomes a Final Order. All payments and transfers due under the terms of This Agreement shall be made within five (5) business days of the entry of a Final Order.

(B) Upon the unanimous consent of all Settling Creditors (but not otherwise) this Agreement may become effective and the payments and transfers which are specified in This [sic] Agreement may be made in advance of a Final Order on any date agreed to by the Settling Creditors following the date upon which This [sic] Agreement is So Ordered.

First Amendment to Settlement Agreement § 0.8(A) and (B). It seems that section .08(A) is one way to render the Agreement "effective." The "agreement will not be effective except" [when the provisions of B are followed or A is carried out] is a paraphrase of the operative clauses. Section .08(B) permitted settling parties to do what they in fact did. Camerican admits the Settling Parties were allowed to do what the Agreement contemplates. Camerican contends the Settling Parties will then have to suffer the risks of reversal. Camerican Dismissal Opposition at 5. On the contrary, Camerican will have to suffer the consequences of its insouciance. Section .08(b) allowed the agreement to be-

come effective. The Order Approving Settlement permitted appellees to do what they did. The price of pepper had declined over a dollar a pound since the start of bankruptcy proceedings and had then recently rallied. Under these circumstances Camerican should have sought a stay order. Camerican was unwilling to do this. Equitable principles dictate that the Agreement not be undone.

### Conclusion

All of the transactions contemplated by the agreement having been consummated and relief having been rendered moot, and for the reasons set forth above, the appeal is dismissed.

SO ORDERED.

---

**14.** Insider is a term of art defined by § 101 of the bankruptcy code.

**15.** Camerican had evidently settled its claims to pepper lots earlier. Appellees' Brief at 13; Tr. at 52.