84

In the Matter of QUALITY SPICE, Debtor.

QUALITY SPICE CORPORATION, Debtor and Debtor–in–Possession, Plaintiff,

v.

FEDERATION WAREHOUSE, New York, Piggyback Services Inc., Uncommon Carrier Warehouse, Inc., Pouch Terminal, Inc., Van Brunt Warehouse, Inc., Importers Storage, Inc., Berks Warehouse & Trucking Corp., Commodity Warehouse Inc., ETO Sterilization, Inc., Griffith Micro Science Inc., Manhattan Milling & Drying Co., Inc., Global Traffic Systems, Inc., and Baltimore Spice, Inc., Defendants.

UNSECURED CREDITORS' COMMITTEE, Intervenor and Third Party Plaintiff,

v.

A–1 INTERNATIONAL COURIER SERVICES, et al., Third Party Defendants.

Bankruptcy No. 88–00460.
Adv. No. 88–0165.

United States Bankruptcy Court, D. New Jersey.

Dec. 28, 1989.

Scheider & Wiener by Jeromy Galton, Newark, N.J., for First Fidelity Bank.

Torre, Schumann, Hession, Kennelly & Dorment by Louis Della Torre, Jr., Jersey City, N.J., for HCL Trading Corp.

Lasser, Hochman, Marcus, Guryan & Kuskin, Roseland, N.J., by Barry Eisenberg, New York City, for Gel Spice.

Bigham, Englar, Jones & Houston by Theodore Cunningham, Robert Phillips, James Simonsen, New York City, for Jantzen and Deeke, Gm v H.

Proskauer, Rose, Goetz & Mendelsohn, Steven Stein, Juliet Sarkessian, New York City, for Ludwig Mueller Co., Inc.

Mahoney & Keane, Edward Keane, New York City, for Hiang Kie.

## OPINION

DANIEL J. MOORE, Bankruptcy Judge.

The Court presently considers the Omnibus Motion of First Fidelity, N.A. ("First Fidelity" or "Bank") which seeks the release of various Lots [1] of pepper located in warehouses throughout New Jersey and New York. The Lots, subject of this motion, are particularized on Schedule D of a report prepared by the accounting firm of Peterson & Co., Consulting ("Peterson & Co."). Specifically, Schedule D reflects those Lots of pepper which are still in the possession of various warehouses. The Bank's Omnibus Motion arises in an adversary proceeding instituted by the Debtor, Quality Spice Corporation ("Quality Spice" or "Debtor"), against certain public warehouses and spice processors who have possession of certain quantities of spice. Debtor asserts an interest in this spice as of the time it filed its petition. The Creditor's Committee intervened in the action and, as a third party plaintiff, added more than 250 party defendants to the proceeding. The third party defendants are entities which either owned pepper or claimed Lots of pepper in which Debtor appeared in the chain of title. This is a proceeding arising under, arising in or related to Chapter 11 of Title 11 of the United States Code ("U.S.C."). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the standing Order of Reference entered by the District Court of New Jersey on July 23, 1984. The following constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

\* \* \* \* \* \*

Some of the case history is set forth in an unrelated opinion rendered in connection with Debtor's application to assume and/or assign certain executory contracts; nevertheless, a brief summary is provided here.

Before Debtor filed for bankruptcy protection, it was a major factor in the pepper trading market. Although pepper trading is not conducted on any recognized commodity exchange, those entities which trade and purchase pepper, as a matter of course, use a form contract established by the American Spice Trading Association ("ASTA"). Quality Spice used such a form contract.

Although a major pepper trader, Quality Spice's pre-petition business affairs were in total disarray. This was precipitated in part by the serious illness of the wife of Debtor's president, Robert Newhouse. Internally, Debtor was having difficulties with its lender, its trading partners and its customers, some of whom were end-users of pepper. Before filing its Petition, Debtor tried unsuccessfully to allay fears amongst its major customers with respect to open purchase orders at a January 1988 meeting. Debtor advised all in attendance that unless it received their cooperation and the cooperation of its lenders, it would be unable to fulfill its open contracts for the sale and purchase of pepper. Thereafter, Debtor's worst fears became a reality, for when it filed its Petition, there exist-

---

1. The capitalization of the letter "L" in the word Lot is to distinguish the word used to designate and identify quantities of pepper from the word lot which has several meanings including many in number. A Lot contains approximately 33,000 lbs of pepper which is a lot of pepper.

ed open contracts to sell pepper in an amount in excess of $40 million. Buy contracts covered most of the contracts to sell.

During this bankruptcy proceeding it became clear that Debtor's records alone were insufficient to untangle the web of competing claims to pepper, which was being stored in public warehouses or held in processing plants for compliance with Food and Drug Administration requirements.

The Court enjoined the commencement of any actions with respect to disputes over the ownership to pepper in which Debtor held or appeared in the chain of title. The Creditor's Committee simultaneously filed an application to retain the accounting firm of Peterson & Co. to identify the location of and competing claimants to the spice. To this end, the accounting firm intensely reviewed the books, records and physical inventory of Debtor as well as the certifications submitted by claimants in this adversary proceeding. The firm reviewed the records of the public warehouses and processing plants and from all of this information, compiled a report (the "Peterson Report") which identifies the physical location of the many Lots of pepper in which Debtor held title or appeared in the chain of title. The Peterson Report also provides an analysis of the competing ownership claims to the spice.

The market price of pepper was approximately $2.20 per pound when Quality Spice filed in bankruptcy. A Lot of pepper generally consists of fifteen (15) metric tons, or approximately 33,000 pounds. The ultimate resolution and disposition of the competing claims and interests to the many Lots of pepper has a substantial impact upon the Estate that is not to be sneezed at. As such, the Court is compelled to make final determinations with respect to ownership claims to the spice. Since the Peterson Report was issued, various parties have moved to obtain delivery of certain Lots of pepper. First Fidelity is one such party.

First Fidelity is Quality Spice's commercial loan lender and asserts that it has a perfected security interest in all of the Lots on Schedule D of the Peterson Report. In addition, the Bank asserts that it possesses delivery orders and/or warehouse receipts covering many of the Lots in question. The Bank filed its Omnibus Motion on September 12, 1988, to release the Lots of pepper enumerated on Schedule D. The following parties filed objections to the Bank's Omnibus Motion, in most instances asserting competing ownership claims to certain Lots of pepper contained on Schedule D: Lonray, Inc. ("Lonray"), DMT New York, Inc. ("DMT"), McCormick & Co., Inc. ("McCormick") and Ludwig Mueller Co. Inc. ("Ludwig Mueller") on October 13, 17, 18 and 19, respectively. First Fidelity is also a third-party defendant to the Unsecured Creditor's Committee's Third Party Complaint. The Bank filed an Answer, Counterclaim and Crossclaim on August 31, 1988. The following parties filed answers and when indicated, Crossclaims against First Fidelity, asserting claims to certain but not all Lots of pepper, some of which are contained on Schedule D: Camerican, a Division of CTC, North America, Inc. ("Camerican") filed an Answer and Crossclaim on September 23, 1988; DMT filed an Answer on October 5, 1988; Lonray filed an Answer on October 12, 1988; Ludwig Mueller filed an Answer on October 17, 1988; Mann Producten Rotterdam B.V. ("Mann Producten") filed an Answer on October 25, 1988; HCL Trading, Inc. ("HCL") filed an Answer, Counterclaim and Crossclaim [2] on April 13, 1988; and Jantzen & Deeke GmvH ("J & D") who originally contested this Court's jurisdiction and filed its answer in State Court, but who later withdrew its objection.[3]

To facilitate a ruling with respect to the ownership rights of the many competing claimants to the various Lots of pepper, the Court scheduled evidentiary hearings on a claimant-by-claimant basis. November 28, 1988 was the date set for the Camerican–

---

**2.** HCL also filed on April 4, 1988 a Certification to Peterson & Co. identifying and documenting Lots to which it claimed title.

**3.** Letter of Theodore S. Cunningham of January 19, 1989, advising the Court of withdrawal of J & D's Motion.

First Fidelity Hearing. However, before the hearing, the parties consensually resolved their differences.

December 15–16, 1988, December 20, 1988 and December 21, 1988 were the dates fixed for the Ludwig Mueller, Lonray and Mann Producten Evidentiary Hearings, respectively. All parties consensually resolved their differences with the Bank on or before these dates.

Evidentiary hearings for the following parties: HCL, V. Berg & Sons, Inc., ("V. Berg") DMT and J & D in December 1988 and January 1989. The Bank's counsel appeared at the hearings as did counsel for all parties, except V. Berg. The following witnesses testified at the hearing: Heinz Levi, President of HCL; Mr. Rally, employee of J & D; and Mr. Pappenheimer, officer of Ludwig Mueller. DMT did not appear but notified the Court that it would rest on its papers [4], which papers include the affidavit of Sharon Z. Dolev, officer of DMT ("Dolev Affidavit"). Additionally, the Court permitted claimant, Hiang Kie PTE Ltd. ("Hiang Kie"), whose interest had been represented by J & D to a late date in these proceedings, to seek independent legal representation because of a possible conflict in having J & D defend its position. Counsel for Hiang Kie appeared at and filed pleadings subsequent to the January 1989 hearing. The parties' positions are as follows.[5]

## HCL

HCL claims to be a buyer in the ordinary course of business, having purchased 1,500 bags of pepper (approximately 75 tons) indirectly from Quality Spice, through Ludwig Mueller, a broker. It claims to hold title to five (5) Lots of pepper. The Lot numbers are 34056, 68802, 68804, 68808 and 69152 also known as ("a/k/a") Alioth B/L # 11 [6].

## DMT

DMT, the last buyer in the chain of title with respect to most Lots, claims to be a buyer in the ordinary course of business as to six (6) Lots of pepper; namely, Lot numbers 2385, 7027, 10968, 50729, 68129 and 68804. All of these Lots appear on Schedule D, save for the first Lot, 2385, which mistakenly appears on Schedule A as being in DMT's possession. In fact, Lot 2385 was still in Pouch Terminal [7].

## J & D and LUDWIG MUELLER

J & D claims to be owner of approximately 150 tons of pepper presently impounded in warehouses in New Jersey and New York pursuant to prior orders of this Court. Of these 150 tons, J & D claims that no party asserts conflicting ownership claims with respect to at least 85 tons, comprised of the following Lot numbers: 2836, 2839, 11287—11, 52310, 1003, 8972 [8]. There exists, however, a conflicting claim to the other 65 tons of pepper identified on the Peterson Report as Lots 8068, (a/k/a 10069) 9045, 9075, 9434, 9435, 12428, 12857. Ludwig Mueller claims that it purchased these Lots from Quality Spice as a good faith purchase for value.

## HIANG KIE

Hiang Kie's claim relates only to Lot 69068.

---

4. Letter of Barry W. Rashkover, counsel for DMT, dated on or about October 17, 1988.

5. Subsequent to the hearings in this proceeding a "global" settlement among First Fidelity, the Debtor, the claimants in this case and other claimants was approved by this Court. The appeal of Camerican from the order of this Court approving the global settlement was denied by the United States District Court for New Jersey in November 1989. 107 B.R. 843.

6. Lots 34056 and 68802 were both taken by McCormick after posting bond in a New York Replevin Action. Lot 68808 was conceded by the parties to this proceeding to Durkee–French Foods, Inc. who now has possession of the Lot. Likewise, Lot 69152 (a/k/a Alioth # 11) was conceded to HCL. (See this Court's order of July 25, 1988).

7. Of these six (6) Lots, the focus of inquiry is on three (3) Lots: 2385, 110968 and 68129. Lots 50729 and 7027 were awarded respectively, to DMT and Camerican during the proceedings. (See this Court's November 28, 1988 Order).

8. The 85 tons were to be released to J & D pursuant to the Settlement Agreement.

FIRST FIDELITY

First Fidelity once argued that it had a security interest[9] in, *inter alia,* Quality Spice's pepper inventory. It claimed to have perfected this interest by filing U.C.C. 1 Financing Statements with the secretary of State of New Jersey and, in some instances, by serving notice on certain New York warehouses. However, since that time, the Bank has waived whatever rights it might have had respecting Lots subject of this opinion. *See,* SETTLEMENT AGREEMENT of January 18, 1989 and FIRST AMENDMENT TO SETTLEMENT AGREEMENT of April 1989.

Several issues require resolution in this matter and relate to provisions of both the New York Uniform Commercial Code § 1–101 *et seq.* (McKinney's 1964 & Supp. 1989) and New Jersey Statutes Annotated 12A:1–101 *et seq.* (West 1962 & Supp.1988), hereinafter collectively referred to as the "U.C.C.".

Preliminarily, the Court finds that most contracts of sale involved in the pepper trade have their terms spelled out in a standard ASTA contract. While spice is not traded over an organized exchange, the ASTA contract has been accepted in the trade as the mechanism through which those involved in the trade buy and sell spice. Paragraph 10, entitled "Tenders", provides in subsection (d) that "[t]ender shall be made by delivery of seller's delivery order addressed to the dock or warehouse where the merchandise is located." However, this term as defined is insufficient to resolve the issue that has arisen concerning whether delivery to the dock or the warehouse of a "non-negotiable copy" of a negotiable delivery order is sufficient to consummate or effectuate the actual transfer of spice. The testimony received throughout these proceedings, although at times inconsistent, is instructive on this point. Heinz Levy of HCL, Kenneth Ralli of J & D, Theodore Dicker of McCormick and Mr. Pappenheimer of Ludwig Mueller provided considerable testimony with re-

spect to delivery orders as they are defined and employed in the trade, as well as the parties' course of performance and course of dealings. In addition, the Court has been benefited by the Dolev Affidavit, which addresses similar concerns. After reviewing the pleadings and affidavits, hearing the testimony of witnesses, considering their extensive experiences in the trade and examining their demeanor, the Court finds the following to be the custom and usage of delivery orders in the spice trading industry. *See,* U.C.C. §§ 1–102(2)(a), (b), 1–205(4) and 2–208(2).

1—A delivery order is a set of four (4) pages. The first page is known as and is marked as "negotiable". This first page is known in the industry as the "original" delivery order and is always negotiable. The next three (3) copies are known as and marked as "non-negotiable copy". These three (3) copies are always non-negotiable.

2—The negotiable delivery order is tendered and delivered to the buyer upon his tender and delivery of payment. As to the three (3) non-negotiable copies, the first copy is sent to the warehouse to inform it of the contemplated sale, the second is sent to the weigher and the third usually remains in the seller/transferror's office.

3—As regards the time of tender, a seller "shall tender on any business day during the month of delivery, but no later than 11:00 A.M. local time on the day preceding the last two business days of the month", but "[a] delivery prescribed for a period of less than one month shall be tenderable on any business day during the entire period." *See,* ASTA Contract, paragraph 10, subsections (a) and (b).

4—Tender shall include the following documents: Salmonella Certificate, Certificate of Analysis and, sometimes, a Tare Certificate. *See,* ASTA Contract

---

**9.** First Fidelity is assignee of a security agreement executed by and between Quality spice and the Bank Leumi as well as a holder of a security agreement executed directly with Quality Spice.

paragraph 10, subsections (f), (g) and (h).

5—To withdraw spice from a warehouse, the buyer must present the bailee with the negotiable delivery order; only that negotiable delivery order enables the buyer to obtain physical possession of the spice. If the first buyer becomes a seller/transferror himself, then he issues to the second buyer/transferee his own negotiable delivery order. In addition, the first buyer turns over to the second buyer the original negotiable delivery order into himself from his immediate transferror, so that the second buyer now possesses two negotiable delivery orders. This process can continue indefinitely until some buyer, usually an end-user, actually withdraws the spice from the bailee warehouse. The prudent warehouseman releases the spice if, and only if, that buyer makes presentment of the negotiable delivery order from his immediate transferror, the negotiable originals from each and every seller/transferror in the chain of title and the appropriate certificates. (collectively "the original backup documents"). This system serves a twofold purpose: first, it establishes a chain of title so to protect a warehouseman and second, it promotes the free flow of commerce by protecting the seller and buyer of spice. The prudent seller who does not release the negotiable delivery order until he is paid, yet otherwise is able to begin the process of weighing, etc., to timely consummate the sale; and the prudent buyer who does not tender payment and take delivery of non-authentic documents of title.

Based upon the foregoing considerations and all evidence submitted, the Court makes the following Conclusions of Law.

*Lots 8068 (a/k/a 10069), 9045, 9075, 9434, 9435, 12428 and 12857*

### J & D v. LUDWIG MUELLER

Ludwig Mueller asserts that the J & D delivery orders issued concerning the 65 tons are negotiable documents of title; that J & D's lodging of "non-negotiable" copies of its delivery orders to a warehouse to the order of Quality Spice transferred good title to Quality Spice on December 16, 1987; and that Ludwig Mueller obtained good title to the 65 tons as a holder of duly negotiated documents of title pursuant to its purchase of the 65 tons from Quality Spice on December 17, 1987. J & D claims Ludwig Mueller acted as a broker in a December 17, 1987 sale between Quality Spice and Catz and the fact that Ludwig Mueller's covered the Catz contract for Quality Spice did not vest rights in Ludwig Mueller to the 65 tons. The Court need not reach J & D arguments because it finds that a sale never took place between J & D and Quality Spice.

█ Initially, the Court finds that the J & D delivery order Nos. 2227 through 2231A are negotiable in form since they are deliverable to Quality Spice's order. U.C.C. § 7–104. However, the lodging of copies of "non-negotiable" delivery orders with Van Brunt Warehouse ("Van Brunt") was not delivery that effected a sale which transferred title to Quality Spice.

Both J & D and Quality Spice had mutual rights and obligations under the governing J & D ASTA Contracts Nos. 2361/87–2363/87 and 2227/87–2232/87. J & D as seller, was obligated to transfer and deliver; Quality Spice, as buyer, was obligated to accept and pay. U.C.C. § 2–301. J & D satisfied its obligation, but Quality Spice did not.

Paragraph 10(d) [10] of the J & D ASTA contract imposes upon J & D the obligation to make tender by offering its documents of title and a delivery order addressed to the warehouse in the buyer's name. The delivery to the warehouse of a non-negotiable delivery order is not a tender under

---

**10.** Paragraph 10(d) of J & D ASTA Contract read in full:

[t]ender shall be made by delivery of seller's delivery order addressed to the dock or warehouse where the merchandise is located.

paragraph 10(d) of the ASTA contract nor under custom in the trade. As such, J & D's obligation was to tender their documents in their correct form. U.C.C. § 2–503(5)(a). As established throughout these proceedings by the parties' course of dealings and the custom and usage in the spice trade, the correct form is the negotiable delivery order, the first page of the four page set. *See Supra,* pp. 87–88.

Thus, J & D was obligated to tender the original delivery orders covering the 65 tons to Quality Spice on or before 11:00 A.M., local time, not later than the day preceding the last two (2) business days of December, 1987, the month of delivery under J & D ASTA Contract Nos. 2361/87–2363/87 and 2227/87–2232/87. On or around this time, J & D sent its messenger to the offices of Quality Spice with the negotiable delivery orders covering the 65 tons. Upon this tender, J & D was entitled to have Quality Spice accept tender of the documents of title and pay according to the contract price. U.C.C. § 2–507(1). The price under J & D ASTA Contract Nos. 2361/87–2362/87 is $2.39 per lb.

> "NETT CASH AGAINST DELIVERY ORDER AND AGAINST PROVISIONAL INVOICE FOR 100% OF INVOICE AMOUNT ACCOMPANIED BY ANALYSIS AND TARE CERTIFICATES ...".

The price under J & D ASTA Contract Nos. 2227/87–2232/87 is $2.07 per lb.

> "NETT CASH AGAINST DELIVERY ORDER AND AGAINST PROVISIONAL INVOICE FOR 98% OF INVOICE AMOUNT ACCOMPANIED BY ANALYSIS AND TARE CERTIFICATES ...".

At the time of tender, the Debtor's president, Robert Newhouse informed J & D's messenger that Quality Spice would be unable to pay the contract prices. When payment is due and payable upon delivery, a buyer's right to retain or dispose of goods as against a seller is conditioned upon the buyer's making payment. U.C.C. § 2–507(2). That payment is also a condition to a seller's duty to tender and *complete delivery.* (Court's own emphasis)

U.C.C. § 2–511(1). Accordingly, since Quality Spice did not tender payment to J & D for the 65 tons, it had no right to retain or dispose of the 65 tons as against J & D, nor did J & D have the duty to complete delivery. In fact, J & D did not complete delivery because its messenger returned to J & D's New York offices with the original delivery orders.

When a seller is required to deliver documents of title and when the goods which are the subject of that contract are not to be moved, title passes at the time when and place where he delivers such documents. U.C.C. § 2–401(3)(a). Those documents were never delivered and a sale was never consummated between J & D and Quality Spice. U.C.C. § 2–106(1).

Ludwig Mueller argues that when J & D noticed Van Brunt of its proposed sale to Quality Spice, by lodging with it "non-negotiable" copies of the negotiable delivery orders, it effectively tendered delivery to Quality Spice which effectuated the transfer of title and fixed its rights as against the bailee and all third parties. It cites U.C.C. § 2–503(4)(b) in relevant part:

> Where goods are in the possession of a bailee and are to be delivered without being moved ... tender to the buyer of a non-negotiable document of title or of a written direction to the bailee to deliver is sufficient tender unless the buyer seasonably objects, and receipt by the bailee of notification of the buyer's rights fixes those rights *as against the bailee and all third persons* ... (Court's own emphasis).

Ludwig Mueller misreads this section and misapprehends its import. First, there was not a tender of non-negotiable delivery orders to Quality Spice, or alternatively, a written direction to Van Brunt to deliver. Quality Spice received nothing and as was the custom and practice in the spice trading industry Van Brunt received non-negotiable copies of negotiable delivery orders. Second, tender of non-negotiable delivery orders to Quality Spice or a written direction to Van Brunt would fix the rights of Quality Spice as against Van Brunt and third parties, it would not fix Quality rights

against J & D. Quality Spice is subject to all real and personal defenses held by J & D against it. Breach of contract for failure of consideration is one such defense. Since Quality Spice never tendered payment to J & D, Quality had no right to retain or dispose of J & D's goods. U.C.C. § 2–507(2). Third, U.C.C. § 2–503 is of little help to Ludwig Mueller since it concerns itself with the manner of a seller's tender of delivery. That section defines tender but does not purport to affect tender, for U.C.C. § 2–503(4)(a) also provides that tender of a negotiable document of title is an acceptable manner of tender. In fact, this was the method required by the express terms of the governing ASTA contracts and was utilized by J & D. This is not a suit against J & D for its failure to tender negotiable documents of title. The facts are that J & D properly tendered the negotiable delivery orders to Quality Spice at the time and place provided for in the governing ASTA contracts. The manner of J & D's tender is not here disputed so much as is Quality Spice's tender of payment, which is the prerequisite to accepting goods. U.C.C. § 2–607.

Adopting Ludwig Mueller's position would have this Court ignore the realities of the case. The parties' course of dealings and the custom and usage in the spice trade clearly call for delivery to the warehouse of an negotiable delivery order, the first page of the four page set, as well as the original backup documents issued by all transferrors in the chain of title. The evidence is clear that a warehouse would not permit withdrawal of the physical commodity but upon presentment of all of these negotiable documents. The custom in the spice trade has a delivery order marked "non-negotiable copy" sent to a warehouse for information purposes only. Therefore, Van Brunt would not, and did not, accept the non-negotiable copy presented by Quality Spice or any other party so as to permit the withdrawal of the physical commodity. Finally, case law recognizes that the sending of a copy of a delivery order to a warehouse does not give title to the goods to the buyer. *See Transmares Corporation v. George F. Smith, Inc.* 76 N.Y.S.2d 737 (NY Cty., Part I, 1947) (sending copy of delivery order to warehouse issued to buyer's order was insufficient to pass the risk of loss to buyer for fire damage to goods); and *J.A. Kirsch & Co., Inc. v. Roulston, Beckert & Co., Inc.,* 178 N.Y.S. 246 (Sup. Ct., App. Term, 1919) (seller disposing of goods in possession of third-party bailee does not fulfill his obligation to deliver until third-party bailee acknowledges to buyer he holds the goods on the buyer's behalf). Van Brunt did not issue notice to Quality advising Quality that pepper was held on its behalf. In sum, Quality Spice could deliver to Ludwig Mueller only as much title to the 65 tons as it had to convey and as to the 65 tons at issue here Quality Spice had no title.

Ludwig Mueller next posits the Doctrine of Voidable Title as a basis upon which it can acquire better title than its transferror had to convey. Ludwig Mueller's reliance on this Doctrine is misplaced. The Doctrine of Voidable Title pertains to Article 2 and not Article 7. The provisions of the former relate to the purchase of the goods themselves, while the latter pertain to the purchase of the documents representing the goods. *Compare* U.C.C. §§ 2–403 and 7–504. *See Good Faith Purchase and Warehouse Receipts: Thoughts on the Interplay of Articles 2, 7 and 9 of the U.C.C.,* 30 Hastings Law Journal 1, 21–23 (1978–1979). Thus, Ludwig Mueller, as a broker/trader, deals with and/or purchases the documents representing the goods, not the goods themselves. It is not an end-user of spice like McCormick and others. It therefore can acquire no greater title than Quality Spice had to transfer. U.C.C. § 7–504.

Ludwig Mueller argues further that it is a holder of a duly negotiated document of title and as such acquired title to the documents and title to the goods.

A document of title is duly negotiated when (a) negotiated (b) to a holder who takes (c) in good faith (d) without notice of any claim or defense against it and (e) gives value (f) in the regular course of business. U.C.C. § 7–501(4).

■ Ludwig Mueller is not a holder to whom a document has been duly negotiated because the original delivery orders covering Lots 9434, 9435, 9045, 9075, 23428, 23857 and 8068/10069 were never negotiated in the first instance to Quality Spice. Negotiation of order paper requires endorsement and delivery. U.C.C. § 7-501(1). J & D never delivered the negotiable delivery orders to Quality Spice, and Quality Spice could not deliver to Ludgwig Mueller documents to transfer title to Ludwig Mueller. Knowing as it did the custom and practice in the industry Mueller could and should have required that Quality furnish evidence of its title, i.e. a delivery order to Quality or even a non-negotiable warehouse receipt. Furthermore, the value Ludwig Mueller paid is predicated upon the debt Quality Spice incurred to Ludwig Mueller when the latter covered the Quality Spice sale to Catz. This being so, Ludwig Mueller is not a holder of duly negotiated documents since it did not give value. The concept of value in negotiation excludes receiving the document in settlement or payment of a money obligation. U.C.C. § 7-501(4).

Moreover, Ludwig Mueller has been a major figure in the pepper trade for an extensive period of time. It knew, or should have known, that the ability of Quality Spice to tender or make delivery hinged on whether it possessed either a negotiable delivery order from its transferror or, alternatively, documentation that Van Brunt held the commodity for the account of Quality Spice. Ludwig Mueller cannot qualify as a buyer in the ordinary course.

Finally, the Court finds nothing regular about the business of Quality Spice supplying Ludwig Mueller with blank delivery orders for the purpose of having it complete the terms of transfer and negotiate to itself documents of title. It is also questionable whether Ludwig Mueller had notice of possible claims against these Quality Spice Lots. For one reason, it knew of Catz's difficulty in obtaining the Lots for

which it covered and, for a second reason, it deviated from the course of dealings and custom and usage in the spice trade by not requiring of Quality Spice delivery of J & D's original negotiable delivery order into Quality Spice. Ludwig Mueller would have easily discovered that title to the 65 tons remained vested in J & D, not Quality Spice. Even if Ludwig Mueller were buying goods rather than documents and entitled to Article 2 Protection, the same reasons disqualifying it from Article 7 protection would also disqualify it from Article 2 protection.

In conclusion, J & D is a holder of duly negotiated documents of title respecting the 65 tons (Lots 8068 [a/k/a 10069], 9045, 9075, 9434, 9435, 12428 and 12857) and is entitled to immediate turnover of that tonnage.

## LOT 2385
### J & D v. DMT

DMT and J & D are parties asserting competing ownership claims to Lot 2385 [11]. A review of DMT's submissions finds that DMT contracted to purchase Lot 2385 from Yah Shen Chong, S.A. ("YSC") on August 5, 1987 (Dolev Aff. Exh. A–1), received from International Brokers, Inc. ("International Brokers" for YSC) on January 4, 1988 an original delivery order covering Lot 2385 (Dolev Aff. Exh A–2–1), was invoiced for Lot 2385 on January 4, 1988 (Dolev Aff. Exh. A–3–1), paid this invoice on January 6, 1988 (Dolev Aff. Exh. A–3–2), requested of Pouch Terminal on January 12, 1988 that it issue a warehouse receipt for Lot 2385 (Dolev Aff. Exh. A–3–3) and was advised by International Brokers on January 19, 1988 of its refusal to issue a warehouse receipt due to the existence of conflicting delivery orders (Dolev. Aff. Exh. A–3–4). DMT has produced the following backup documents: Quality Spice delivery order into Ludwig Mueller (Dolev. Aff. A–2–6), Ludwig Mueller delivery order into Gel Spice (Dolev Aff. A–2–5), Gel Spice delivery order into Attari Bros. (Dolev Aff. A–2–4), Attari Bros. delivery order into In-

---

11. Ludwig Mueller originally asserted but waived any claim to Lot 2385. (Letter of Juliet Sarkessian, counsel to Ludwig Mueller, dated April 11, 1989).

ternational Brokers (for YSC) (Dolev Aff. A–2–3), International Brokers (for YSC) delivery order into DMT (Dolev Aff. A–2–1), Certificates of Salmonella, Analysis, Weight and Tare (Dolev Aff. Exhs. A–2–7 2–9). Significantly, DMT has not produced all backup documents to establish and complete the chain of title. Absent from the Dolev Affidavit is the original negotiable delivery order from J & D into Quality Spice. A document was produced and introduced into evidence by Ludwig Mueller at the January 1989 trial. (*See* exhibit LM–8). The document is marked "non-negotiable copy" as were the delivery orders submitted in connection with the dispute concerning the 65 tons. A review of the evidence reveals that the facts surrounding the 65 ton transfer from J & D to Quality Spice surround the transfer of Lot 2385. Therefore, in adopting the same conclusions of law here, the Court finds that J & D is the owner of Lot 2385 and is entitled to turnover of that Lot forthwith.

## LOT 69068
### HIANG KIE v. THE ESTATE OF QUALITY SPICE AND/OR FIRST FIDELITY

The disputing parties to Lot 69068 are Hiang Kie and the Estate of Quality Spice and/or First Fidelity. A review of the relevant documents reflect that Quality Spice contracted to purchase Lot 69068 from Hiang Kie, through its agent J & D, (J & D Trial Exhibits "J & D T. Exh." JD–1), that J & D noticed the warehouse of the proposed sale with a non-negotiable copy of J & D negotiable delivery order No. 2349 (Ludwig Mueller Trial Exhibit "LM T. Exh." LM–1), that Quality Spice was invoiced for Lot 69068 (LM T. Exh JD–2) and that it never tendered payment for Lot 69068. Hiang Kie argues, *inter alia*, that Quality Spice failed to tender payment for pepper Lot No. 69068 and therefore, there was no sale. Ludwig Mueller advances the same arguments on the estate's behalf as were set forth in the prior section in support of its ownership to the 65 tons. The thrust of its contentions is that the lodging of a non-negotiable copy of a negotiable delivery order with the warehouse effectively transferred good title to pepper Lot 69068 to Quality Spice. The rights and obligations of J & D, here, as selling agent for Hiang Kie, were the same as they were in connection with its contractual commitment to deliver the 65 tons. It was obligated to transfer and deliver documents of title pursuant to paragraph 10(d) [12], which paragraph requires that the documents be addressed to the warehouse in the buyer's name. U.C.C. § 2–301. J & D was obligated to deliver the documents in the correct form. U.C.C. § 2–503(5)(a). The correct form is a negotiable delivery order and not a non-negotiable copy of a negotiable delivery order. This fact is firmly established by the custom and usage in the trade as well as by the parties' course of dealings. The ASTA Contract required "NETT CASH AGAINST DELIVERY ORDER AND AGAINST PROVISIONAL INVOICE ..." (J & D T. Exh. J/D–I). On December 31, 1987, the call month under the ASTA contract, J & D's messenger arrived at Quality Spice's office to tender and deliver the negotiable delivery order covering pepper Lot 69068. Quality Spice had the obligation under the ASTA contract and the U.C.C. to accept and pay "NETT CASH AGAINST DELIVERY ORDER ...". U.C.C. § 2–301. This was a condition to J & D's duty to *complete* delivery and a condition to Quality Spice's right to retain or dispose of the goods as against J & D. (Court's own emphasis.) U.C.C. §§ 2–511(1) and 2–507(2). J & D did not complete delivery as its messenger returned the negotiable delivery order pertaining to Lot 69068 to J & D's office.

Because delivery is a pre-condition to the transfer of title with respect to goods not to be moved under a contract, a sale was not consummated between J & D (for Hiang Kie) and Quality Spice. Accordingly, Hiang Kie is the owner of pepper Lot 69068 and is entitled to its immediate turnover.

---

**12.** See Footnote 10, *supra.*

*LOTS 10968 and 68129*
## DMT v. FIRST FIDELITY

The dispute concerning these Lots originally centered on the rights of DMT as a good faith purchaser for value against those of First Fidelity as a secured party [13]. Inasmuch as First Fidelity has waived its rights to Lots 10968 and 68129, there exists no conflict and DMT has superior title to both Lots as a buyer in the ordinary course of business [14].

*LOT 68804*
## DMT v. HCL

■ The conflict over Lot 68804 is between HCL and DMT [15]. Both DMT and HCL claim to have purchased and paid for this Lot as buyers in the ordinary course of business.

After reviewing all pleadings and testimony received at trial, the Court finds that HCL contracted to buy from Quality Spice Lot 68804 on November 11, 1987 (HCL Cert. Exh. B); that it received a Quality Spice delivery order for Lot 68804 on November 25, 1987 (HCL Cert. Exh. C); that it was billed for Lot 68804 on November 25, 1987 (HCL Cert. Exh. D) and that HCL paid for Lot 68804 on November 27, 1987 (HCL Cert. Exh. E). HCL notified Federation Warehouse of its interest in Lot 68804 and made written demand for its turnover (HCL Cert. Exhs. F & G). Exhibit F is a copy of a FAX transmission on January 19, 1988 advising Federation

"we wish to advise you that we must hold you responsible for any and all losses in the event there should be a delay or refusal to turn over to us these lots..."

Exhibit G is a copy of a FAX transmission dated January 28, 1988 to Federation of the following message:

"In reference to our Fax message of January 19th, we urge you once more to make available to us 105 tons of Brazilian Pepper, covered by delivery orders Nos. 112587B, dated 11/25/87—75 tons (1500 bags)—and 12287–FF, dated 12/2/87—30 tons (600 bags)—and by your warehouse receipt No. 00818396, dated 12/7/87, for the 30 tons, all of which clearly show that this pepper belongs to HCL Trading Corporation. We repeat that we must hold you responsible for any and all losses which we may suffer because of your failure to make available to us the merchandise which belongs to this company, which has been paid for in full by this company, and which is the property of no one else but this company."

The Court also finds that DMT contracted to purchase from Gel Spice Lot 68804 on November 16, 1987 (Dolev Aff. Exh. B–1);

13. Ludwig Mueller originally asserted claims on behalf of Gel Spice in Lots # 2385 and # 68129; and on behalf of Gel Spice and Yang Sang Chong in Lot 10968. Ludwig Mueller supports DMT's position as the last buyer in the chain of title. Lonray, in its objection to First Fidelity's Omnibus Motion, does not assert rights as a good faith purchaser for value with respect to these Lots.

14. The Court is aware that DMT is involved in arbitration proceedings concerning claims it might have as a result of its failure to obtain Federation Warehouse pepper Lots 68129 and 68804, Van Brunt Warehouse pepper Lot 10968 and Pouch Warehouse pepper Lot 2385. To the extend DMT is awarded possession of these Lots and prevails in its arbitrations, DMT has represented, and the Court so requires, that it "either (1) tender the Lots back to the appropriate respondents upon satisfaction of the arbitration awards, or apply the current market value of the pepper at the time it takes possession as an offset to the arbitration awards". (February 17, 1989 letter of Barry W. Rashkover, *Counsel to DMT*, p. 2)

*See also* (Mr. Rashkover's letter of April 22, 1989 concerning same).

15. The Peterson Report indicates that Quality Spice (or First Fidelity as *secured* lender), Mann Producten and Ludwig Mueller are competing claimants to Lot 68804. However, First Fidelity conceded its interest in this Lot at the HCL/DMT evidentiary hearing on December 22, 1988. (Transcript, p. 15). Mann Producten initially claimed an interest in Lot 68804 in its April 6, 1988 Certification, filed with the Court on November 2, 1988. Since then, it has failed to object to First Fidelity's Omnibus Motion and otherwise press its claim with respect to this Lot. Ludwig Mueller supports DMT's position since it claims on behalf of Gel Spice who is in the chain of title. *See* (Ludwig Mueller's letter in support of DMT's Ownership to Lots 2385, 10968, 68129 and 68129, dated to and filed with the Court on February 13, 1989 and February 14, 1989 respectively).

that it received a Gel Spice delivery order for Lot 68804 on January 4, 1988 (Dolev Aff. Exh. B–2–1); and that it was billed and paid for Lot 68804 on January 5, 1988 (Dolev Aff. Exhs. B–3–1 to 3–2). DMT perfected its interest in Lot 68804 by causing Federation Warehouse to issue on March 10, 1988, a warehouse receipt (Dolev Aff. Exh. B–3–3 to 3–4).

Sharon Z. Dolev filed on behalf of DMT an affidavit setting forth, *inter alia*, that DMT purchased and paid for Lot 68804 from entities other than Quality Spice, all of whom are regularly involved in the pepper trading industry (Dolev Aff. p. 2). She possesses personal knowledge of the means by which DMT and others purchase and sell spice. To establish its superior ownership claim, DMT has submitted the negotiable delivery order from Gel Spice (Dolev Aff. Exh. B–2–1) as well as all backup documents issued in the chain of title: Ludwig Mueller delivery order into Gel Spice (Dolev Aff. Exh. B–2–2), Quality Spice delivery order into Ludwig Mueller (Dolev Aff. Exh. B–2–3), Certificate of Analysis (Dolev Aff. Exh. B–2–4) and Salmonella Analysis (Dolev Aff. B–2–5).

A buyer in the ordinary course of business "... means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buy in ordinary course from a person in the business of selling goods of that kind ...". U.C.C. § 1–201(9). That DMT purchased from someone other than Quality Spice and that it holds all backup documents is significant with respect to its ownership claim to Lot 68804. It would not have reason to believe that there existed a cloud on title to Lot 68804 since it possessed all the proper documentation to establish the chain of title. Moreover, Federation Warehouse has a duty to deliver Lot 68804 to DMT pursuant to Federation Warehouse Receipt No. 00821379. *See* U.C.C. § 7–403.

Starkly contrasting these facts are those surrounding HCL's purchase of Lot 68804.[16] Heinz Levy testified at length at trial on December 22, 1988, that he has been engaged in the pepper trading business for approximately forty-five (45) years, of which approximately thirty-four (34) years have been on his own (HCL Trial Transcript "HCL TT" P. 23); that he has engaged in thousands upon thousands of transactions (HCL TT p. 24) and that Lot 68804 was acquired through five (5) or six (6) business transactions with Quality Spice, whereby Quality Spice would sell certain Lots of pepper to HCL who would, then, simultaneously contract to sell back the same spice for delivery 40 to 60 days later at a higher price (HCL TT p. 47). He testified further that these five (5) or six (6) transactions were not the normal way of dealing in commodities (*Id.*); that part of the reason he entered into these types of transactions was because of the reputation and integrity of the broker (HCL TT p. 48), but that in his estimation and the broker's estimation, Quality Spice either wanted to show the bank a low inventory or a bigger turnover (HCL TT p. 50); that, beside these five (5) or six (6) transactions with Quality Spice, he could remember only one (1) or two (2) transactions of the same nature (HCL TT p. 51); and that this type of transaction occurred usually between friends (HCL TT p. 52).

These five (5) or six (6) business transactions with Quality Spice were anything but ordinary and regular when compared to the thousands upon thousands of transactions engaged in by HCL with others throughout its thirty-four (34) years of existence. The U.C.C. is not intended to protect parties who are friends and on that basis, transact business outside the ordinary and regular course of business. While in form the transactions resemble bona fide sales, in the Court's opinion, they are secured loans with respect to which the security interest was not perfected. It is clear from the testimony that HCL is neither a buyer in the ordinary course of business nor one to

---

**16.** There is also a contrast in the manner in which HCL handled the two transactions referred to in Exhibit F and G of the HCL certification. For the pepper covered by the second contract and delivery order HCL promptly obtained a warehouse receipt.

whom a document has been duly negotiated, that is, a person who purchases in good faith in the ordinary and regular course of business. U.C.C. §§ 1-201(9) and 7-501(4).

On the other hand, DMT's purchases were made according to ordinary business terms from entities regularly engaged in the trading and/or selling of spice. Accordingly, as a buyer in the ordinary course, DMT is entitled to turnover of Lot 68804 [17].

## CONCLUSION

For the foregoing reasons, the Court concludes that J & D is the owner of and entitled to turnover of the 65 tons and Lot 2385, as there was no sale between J & D and Quality Spice. Hiang Kie is entitled to turnover of Lot 69068 for the same reasons and DMT, as a buyer in the ordinary course of business, is entitled to the immediate turnover of Lots 10968, 68129 and 68804, subject to the conditions set forth in footnote 14.

The prevailing parties should submit appropriate orders within two weeks from the date hereof.

John H. Appleton, Nogi, Appleton, Weinberger & Wren, P.C., Scranton, Pa., panel trustee.

David S. Brady, Office of U.S. Trustee, Harrisburg, Pa., Robert R. Long, Sr., Asst. U.S. Atty., Scranton, Pa.

---

**17.** Although this determination is based on the finding that HCL was not a buyer in the ordinary course of business it could also rest on the equitable principle that as between two "innocent parties, the party who conduct allowed the wrong to occur should bear the loss." See UCC.